NEID (UNITED STATES v.). See Case No. 15,860.

---

## Case No. 10,086.

NEIDLINGER et al. v. INSURANCE CO. OF NORTH AMERICA.

[10 Ben. 254.] [1]

District Court, E. D. New York. Jan., 1879. [2]

MARINE INSURANCE—DAMAGE BY ACTUAL CONTACT OF SEA WATER—DAMPNESS OF A SHIP'S HOLD.

1. The shipper of a cargo of barley, in sacks, from San Francisco to New York, insured it against perils of the seas. The policy contained a memorandum clause by which grain was to be "free from average unless general," also "free from damage or injury from dampness, change of flavor, or being spotted, discolored, musty or mouldy, except caused by actual contact of sea water with the articles damaged, occasioned by sea perils," "subject to 20 per cent particular average." The ship met with heavy weather on the voyage and put into Rio, leaking, where, part of her cargo having been discharged, she was repaired and then, having been reloaded, she completed the voyage to New York. On the discharge of the cargo, a portion of the sacks were found to have been wet with sea water, and the barley in them damaged thereby, but the damage on that part of the cargo did not equal 20 per cent of the property insured. But it was found that the malting quality of the rest of the cargo had been destroyed, as it was claimed, by dampness of the hold, arising from the leak, and such damage amounting to more than 20 per cent, a libel was filed against the un-

derwriters to recover the whole loss: Held, that, assuming that the damage to the sacks of barley, which were not reached by the sea water, was caused by damp vapor arising from other sacks that were reached by the sea water which came into the vessel through a peril of the seas, such damage was not caused by actual contact of sea water with the articles damaged, within the meaning of the policy; and that the insurance company was not liable on the policy.

2. The cases of Woodruff v. Commercial Mut. Ins. Co. (2 Hilt. 130), and Cory v. Boylston Fire & Marine Ins. Co., 107 Mass. 143, commented on.

[This was a libel by Adam Neidlinger and others against the Insurance Company of North America.]

W. W. Goodrich, for libellants.

C. A. Hand, for respondents.

BENEDICT, District Judge. In October, 1876, the libellants obtained from the defendant, by open policy and certificates, insurance to the amount of $17,600 upon 21,068 43/48 bushels of barley from San Francisco to New York on the ship Blue Jacket. The policy was in the usual American form against perils of the seas. By the memorandum clause grain of all kinds was warranted by the assured "free from average unless general," and also "free from damage or injury from dampness, change of flavor, or being spotted, discolored, musty or mouldy, except caused by actual contact of sea water with the articles damaged, occasioned by sea perils." The memorandum was qualified by the certificates, which contained the words, "Subject to 20 per cent particular average."

The barley was shipped in sacks, and the bills of lading issued therefor described the property as so many sacks of barley. There was other barley in the ship—also shipped in sacks—and there was some pig lead, wool, rags, borax and other cargo. The barley was stowed in tiers, the lower tier resting upon a grain ceiling over the pig lead, old sails being spread for dunnage between the ceiling and the ground tier of barley. During the voyage and while the ship was in the South Atlantic, she sprung a leak through a peril of the seas, and thereby sea water was taken into the hold, which came in actual contact with those sacks of barley composing the lower tiers, and with some in the wings. In consequence of the leak, the vessel bore up for Rio, where she arrived on the 15th day of January, having experienced heavy weather and having at times had from 22 to 24 inches of water in her hold. Upon arrival in Rio all the cargo, except the barley composing the lower tier and some in the after end of the ship was taken out. The ship was then docked and repaired. The barley and other cargo taken out was then restowed in the ship, and on the 18th day of March the ship sailed for New York, where she arrived without further disaster on the 11th day of May. Upon discharging the cargo in New York, certain of the libellants' bags, especially those

---

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court, 11 Fed. 514.]

composing the lower tier, showed marks of sea water, and were caked and badly damaged by actual contact with sea water.

The evidence will not permit the conclusion that of the libellants' bags a greater number than 5,360 were in actual contact with sea water. Indeed, it is quite evident that the number of bags so damaged was less than 5,360. The rest of the barley was bright in color, and to all external appearance merchantable. But by testing samples it was discovered that the malting quality of the barley had been destroyed, and in consequence it was unsaleable as merchantable barley fit for malting. Accordingly all was sold at auction, when it brought a price far less than the market price of barley fit for malting.

This action was then brought by the owners of the barley against the underwriters, to recover for the loss upon the barley insured by them, as ascertained by the auction sale.

In regard to the 5,360 sacks above mentioned, it may, for the purposes of this case, be considered to have been proven that the damage was caused by actual contact of sea water with those sacks. In regard to the damage to the remainder, it may, for the purposes of this case, be considered to have been shown to have been caused by dampness in the ship's hold. The most favorable view for the libellants is to consider the evidence as warranting the inference that the sea water which leaked into the ship prior to her arrival at Rio, by creating a damp atmosphere in the hold caused germination to commence in the barley, which being thereafter checked by heat, left the barley dry, bright, and to all appearances sound, but incapable of further germination.

It is conceded that the loss on the 5,360 sacks is not sufficient to charge the underwriters—that loss not amounting to 20 per cent of the property insured. But if to the loss on the 5,360 sacks there be added the loss on the remainder, arising from the destruction of the malting capacity, then the amount of loss is sufficient to warrant a recovery upon the policy. The question to be determined, therefore, is, whether the underwriter is liable upon the policy for damage to sacks of barley that were never reached by the sea water, assuming it to have been shown that such damage was caused by damp vapor arising from other sacks that were reached by the sea water which came into the vessel through a peril of the seas. Was such damage caused by actual contact of sea water with the articles damaged, within the meaning of the warranty in the policy contained? If so, the libellants are entitled to recover; otherwise, not.

The question thus presented does not appear to have been passed on in the national courts of the United States. It has, however, been considered in the state courts, and the cases there adjudged deserve respectful attention. It will conduce to the understanding of those cases to notice the circumstances un-

der which the warranty in question came to be inserted in policies of insurance, and then to examine in chronological order the adjudications made in regard to the effect produced by the provisions.

In the year 1851 a question arose in the English courts in regard to the liability of an underwriter in a case where hides and tobacco had been shipped together, and the tobacco was injured in flavor by a fetid odor arising from the hides, which had been wet by sea water shipped during the voyage by peril of the seas. The policy contained no limitation of the underwriter's liability other than that contained in the ordinary memoranda, and the plaintiff recovered, upon the ground that the natural and almost inevitable cause of the flavor communicated to the tobacco was the access of sea water to the hides by a peril of the sea. Under such a policy it is not necessary, said Martin, B., "that sea water should be in absolute contact with the injured article." Montoya v. London Assur. Co., 6 Exch. 459.

In the same year the case of Baker v. Manufacturers' Ins. Co., 12 Gray, 603, came before the supreme court of Massachusetts when the liability of the underwriter was asserted in respect to damage to delicate French goods arising from an extraordinary formation of steam and gases occasioned by an extraordinary access of sea water to the hold, caused by perils of the seas.

In consequence of these decisions—as it has been supposed, and as the language of the warranty indicates—the warranty under consideration was thereafter inserted in policies, whereby the property insured is "warranted by the assured free from damage or injury from dampness, change of flavor, or being spotted, discolored, musty or mouldy, except caused by actual contact of sea water with the articles damaged occasioned by sea perils."

In 1858 the effect of this warranty came to be considered by the court of common pleas in the city of New York, in the case of Woodruff v. Commercial Mut. Ins. Co., 2 Hilt. 130, and upon that case the libellants in this action place their chief reliance. The action was upon a policy similar to the one here sued on, to recover for damage to wheat loaded in sacks. The evidence disclosed three kinds of injury. Some of the sacks were damaged by sea water leaking upon them; other sacks were damaged by dampness arising from the sacks that had been in actual contact with sea water; and there was damage caused by effluvia that arose from hides forming part of the cargo which had been wet by sea water through a peril of the sea. The judgment of the court was that the underwriters were not liable for the damage caused by the effluvia from the hides, but were liable for the other damage.

The ground upon which the court based the distinction drawn between the damage caused by effluvia and that caused by dampness, is

to be found in the opinion delivered by Brady, J., where it is said: "If sea water be communicated by absorption, or makes its way upon any other principle of natural philosophy from the articles wet to any part of the same article, the actual contact contemplated by the policy is created." The same idea is conveyed by the language used in the opinion delivered by Judge Ingraham, when, in concurring with Judge Brady, he says: "The dampness referred to in the warranty is dampness to the article when it has come in contact with sea water."

From these expressions it may be inferred that no damage was considered by the court of common pleas to be chargeable to the underwriter, except such as appeared to have been caused by sea water that had been communicated from one bag to another by absorption, or upon some other principle of natural philosophy; and it seems difficult to understand how the court reached its result upon any other ground.

It is not stated in the opinions that the shipment, constituted as it was, of various sacks of wheat, was considered to be a single article; and unless the decision was that the sea water had passed to all the sacks allowed for in the judgment, it would seem that the sacks damaged by effluvia would have been placed in the same category with those damaged by the vapor of the water,—the effluvia, as well as the vapor, being the natural result of the sea water in the ship. If this be the ground of the distinction that was there made between the damp sacks and those damaged by effluvia only, the case affords little support to the libellants here, for in this case the question is in regard to bags of grain to which sea water was never communicated by absorption or otherwise.

But however the case of Woodruff v. Commercial Mut. Ins. Co. may be understood, its weight as authority in favor of the libellants is more than counterbalanced by the decision of the supreme court of Massachusetts in the subsequent case of Cory v. Boylston Fire & Marine Ins. Co., decided in 1871, and reported in 107 Mass. 146; also in 9 Am. Rep. 14. This was a case upon a policy of insurance similar to that issued to libellants. The loss sought to be recovered arose from damage to champagne wine packed in cases and valued by the case. The ruling was that under such a warranty "it is not enough to bring a case within this clause that perils of the sea should be the efficient and, within the rule laid down in the previous decisions, the proximate cause by which the sea water was shipped which more or less directly operates upon and injures the goods; or that sea water should come in contact with part of the cargo; but it must come into actual contact with the articles for the damage to which the underwriters are sought to be charged."

The result of this ruling was that the underwriter was absolved from liability upon a state of facts curiously resembling, as the court remarks, those in the former case of Baker v. Manufacturers' Ins. Co., where the same tribunal had held the underwriters liable. The difference in result arose simply from the insertion of the warranty under consideration here. The case is directly in point and it is adverse to the claim of these libellants.

I have not overlooked the suggestion made in behalf of the libellants that a distinction between that case and this arises from the fact that there the wine was valued by the case in the policy, while here the policy is open. But this is a distinction without a difference. Inserting in the policy a valuation of the articles by the case does not change the nature of the contract. It is still a policy in gross upon a shipment consisting of different articles (Hernandez v. Sun Mut. Ins. Co. [Case No. 6,415]); and so far as the question under consideration is involved the two policies are alike.

The conclusion reached by the supreme court of Massachusetts commends itself to my judgment. It is certainly in harmony with the letter of the warranty, and as I think with the spirit and intention of the parties; and no arguments have been here presented sufficient to lead me to a different conclusion.

It has been said that the vapor arising from sea water is sea water within the meaning of the warranty. But the difference between a case where damage arises from sea water carried by absorption or capillary attraction, and one where the damage is caused by the vapor evolved from sea water, is palpable. The risk is different in the two cases, not only in degree but in character, because the vapor of water is communicated under different circumstances and in obedience to different laws from those that control the movements of water.

Nor can the position be maintained that the barley shipped by the libellants is to be deemed for the purpose of the insurance to be a single article, and, as in Woodruff v. Commercial Mut. Ins. Co., the insurer be held liable upon the ground that all the damage arose from sea water having been communicated by absorption or having made its way upon some other principle of natural philosophy from one part of the article to another part of the same article. For, however the fact may have appeared in Woodruff v. Commercial Mut. Ins. Co., in this case the evidence forbids the conclusion that sea water was ever communicated to any sacks except the 5,360 sacks that displayed marks of the contact of sea water. It is, therefore, impossible upon the evidence in this case to hold that the disputed damage was occasioned by the actual contact of sea water with a part of the article insured. Nor can a shipment of grain in bags be deemed to consist of a single article.

In a case of insurance upon hides before the supreme court of the United States (Bias

v. Chesapeake Ins. Co., 7 Cranch [11 U. S.] 416) the insurance was described as an "insurance in gross on a cargo consisting of a distinct number of articles." If such be the character of an insurance upon hides, certainly an insurance upon grain in sacks cannot be said to consist of a single article.

But it is said, if this be an insurance of many different articles in gross the different kernels of grain constitute the articles of which it is composed, and inasmuch as it would be absurd to suppose an intention by the warranty to compel the insurer to show actual contact of sea water with each kernel of grain, it must have been the intention to treat the barley as consisting of a single article when applying the provision of the warranty. If this were the intention no advantage would result to the libellants, for, as before stated, the damage in dispute did not result from the contact of sea water, but from the contact of vapor. Besides, policies of insurance are commercial contracts, to be construed and applied in view of the methods pursued by the merchants in their dea.ings with each other, and among merchants no notice is taken of the possibility that some of the kernels in a sack of grain that is wet may escape contact with the water; but in the absence of evidence to the contrary they act upon the assumption—sufficiently accurate for all practical purposes—that when sea water comes in contact with a sack of grain it will by absorption be brought in contact with all the grain in the sack. And in such case they would, when ascertaining the part damaged, treat each sack as constituting a single article. The more reasonable supposition, therefore, is, that it was the intention of the parties to this contract that in applying the warranty each sack of grain should be deemed a distinct article. So understood, the warranty will read: "This grain is warranted free from damage or injury from dampness, unless such dampness be caused by actual contact of sea water with the damp sack." If the policy had contained a warranty so worded it would scarcely have been claimed that the insurer was liable for any damage outside of the 5,360 bags which showed marks of the actual contact of sea water.

My conclusion, therefore, is that the libellants have failed to show that a loss equal to 20 per cent of the value insured was occasioned by any peril insured against, and their libel must, therefore, be dismissed, with costs.

[The libelants took an appeal to the circuit court. The decree above was affirmed. 11 Fed. 514.]
[See Case No. 1,569.]